Thank you. Good morning, Your Honors. My name is Daniel DeLasso, and I'm here on behalf of the eight servicemen who died and the 14 who were injured in the crash of Aircraft 472. I'd like to reserve five minutes for rebuttal. May it please the Court. The companies that sell products to the military are only immune from liability for defects in those products when the military mandated that the manufacturer build the defective components in a certain way. In this case, there are essentially two theories about what caused this aircraft crash. The first is that an electrical anomaly caused the digital electronic control unit or the fuel control computer to fail. Do we know what that anomaly was? I've seen it in there. Anomaly means nobody knows. Well, we know what the anomaly is used in this case to define an electrical impulse that sends an erroneous signal. And in the record in the IPT investigation, they investigated a way to short out certain electrical inputs that would cause certain aspects of the DECU to be fooled into thinking that the engine was shutting down when in fact it was not and caused the windmill bypass valve to shut off fuel. And that's important because in the Sullivan email, we see that there was never a specification written called an electrical interface control document. The reason that's an important specification in this case is because the DECU is a computer and it takes inputs from the throttles, from the pitot system, from all these different systems on the airplane to manage the engine output. And in order to understand that, the government asked the manufacturers to produce a specification that would say what is the input that needs to come from this component to correctly drive the DECU. And that becomes important because the court will recall they also asked for what are the tolerances. The tolerances are important because if the voltage drops or is above that which is called out, the Army needed to know what is the effect of that. Will that cause a fault to occur that is then not reported by the unit but causes a malfunction in the airplane? And the analogy now that we all are driving kind of computer-driven cars, you know that sometimes a light will come on in the dash and you take it to the dealer and say, this light came on that said something was wrong. And the dealer says, well, I ran a test and really nothing was wrong or it doesn't report anything was wrong. That doesn't mean something didn't occur. It just meant that the electrical impulse was spurious, anomalous. It occurred instantaneously. It caused a problem and it went away. And in this engine, the court will recall from the record, they talked about an issue with that relative to sampling time. The court reports where they said you could get an input that said shut down the engine. It was never recorded because it sampled every half a second. What does that mean? Well, the analogy I like to use is if we went out to take a picture of lightning and we set our camera to take a picture every half a second and the lightning actually struck the ground in a quarter of a second, a quarter of a second later the camera goes off, it doesn't mean the lightning didn't strike. It just meant that we didn't see it. So that component was critical. That specification was never written and that specification was cut across all three manufacturers. And that's significant in this case because Boeing obviously has taken the position that we just built the airframe. The government supplied the engine. Goodrich says we supplied the engine but somebody else supplied the FedEx system. While that's true as a practical matter, none of those components have any value to this helicopter unless they work together to make it fly. And that's why everything has to talk to everything and that's the specification that's missing. And that was the specification that was not discovered until the IPT investigation, which is evidence that perhaps the Army's oversight was not as great as the defendants have represented because they missed that. And the other thing it indicates is that this was a product that was already designed and developed before the manufacturers came to the Army and said we have a fuel control system for you. We would like you to buy it. They approached the Army with an already designed component and the Army ultimately decided to buy it. But in terms of the nuts and bolts design discretion and design detail, they simply weren't involved. And the level of their involvement I think it speaks volume to say here's something that was called out in 1988 to have been produced and lo and behold when we look back we don't have it and we can't find it. So that we would submit is dispositive on the first prong of Boyle. And in our discussion today I'm just going to focus on the strongest evidence that supports our position as to each prong as opposed to going through each one. But before you get into that, let me ask you about another issue that seems dispositive to me. This helicopter seems to have been engaged in combatant activity. Can you tell me why this was not combatant activity? I can, yes, Your Honor, for two reasons. First, in terms of what was occurring at that point, the record is clear that any- It was coming back. The combat activity was all over. They were getting delivered back to the base. You think if somebody goes to the front, it's no longer activity of a combatant. The word is not combat. It's combatant activity. That's correct, Your Honor. It has to come back, doesn't it? He does. But I think there's a distinction and Cooey makes this clear. There's a distinction between I'm coming back in a truck that runs over a landmine and I'm coming back in a truck that has a defective transmission that seizes up and causes the truck to go off the road. That's not the way the exception is written. The exception is for combatant activity. And activity is forward and back. How do we get around that? True. We get around it because what Cooey looked at is combat activity is one place that you can decide this issue. The other place you decide- What's that? It's one factor to look at. No, it is the exception. It's called the combat activities exception, but in terms of applying the government's immunity to a manufacturer, because they're saying the combat activities exception is if the government or the Army makes tactical decisions, you can't sue them for that. No, it doesn't say that. It says if it's engaged in combatant activity. It is, but- A helicopter is engaged in activity. That's correct. The activity is that of a combatant. That's correct. The helicopter was engaged, but at the time the manufacturers designed and built it, they were not engaged in combat activities. No, of course not. That's a ridiculous case. That's true. But the point is what the Court in Cooey says, what this Court said in Cooey said, and the reason we carved this exception out is based on duty. Manufacturers don't have duty to enemy or perceived enemy. Oh, you think it only applies to enemies. I think it's more than one case. If it was to be just combat, and combat was the reason for immunity, it would lead to inconsistent results. How would that be true? It's not combat. It's combatant activity. The same --? It would lead to the same- No.   Let's say for example, that a manufacturer is engaged in combatant activity. Let's say for example, that this helicopter crashed on a training mission when there was no combat activity. Training is not a combat activity. Pilot training. Of course. Sure. So it crashes, and the people killed in that crash are allowed to bring a case. Right. And then Boyle would apply. Why is that so true? But then we take that same helicopter, and now, a year later, when it's in Afghanistan, it crashes, and we say, oh, no, no, no. You same soldiers don't have a claim now. That's the way Congress wrote the law. There's nothing strange that Congress draws lines. Well, but Congress wrote the law to protect the government, not the contractor. And in Cooey, in Cooey, what the Court said is, are we going to extend the law? Well, that's your hypothesis. It seems to me quite likely that Congress thought, if you're in combatant activity, nobody can tell what goes wrong and why something happens. We're going to create an exception. And there it is. And that's the end of your case. Well, but they created the exception for the government and not the manufacturer. That's where the duty analysis. That's your imagination, but go ahead. Well, but that's where the duty analysis came in that this Court talked about. It said, we're going to look at those things. And in the next case where it was applied in Betzlin, it was the same result. It was saying that, look, there was no duty owed by a manufacturer to an enemy or a perceived enemy. And because the government has no duty, we're not going to extend that to the manufacturer. I understand your argument. I'm totally unimpressed by it. Let me offer that. Go on. My colleagues may like the other arguments. Let me talk for a moment then about the second alleged cause of failure here, which is the ignition system. Again, under Boyle, there has to be a showing that the Army made these manufacturers design this engine without an ignition system that would account for a flame-out due to the ingestion of water. That raises several questions in this case, all of which should be answered for the plaintiff. The first is the fact that the specification says this will be made, there won't be any continuous ignition in this, that's the specification for the engine, and the second is the fact that the specification says there will be no specific, there will be no continuous ignition, raises an issue of fact. And the issue of fact under a Boyle analysis is how did that get in there? And if it got in there merely because the manufacturer who had primary design responsibility put it in there and the Army looked at it and without more decided to go ahead and sign off, then that's not enough under Boyle for prong one. Why isn't it enough? The Army says, okay, this is going to happen 1 in 20 million times, we don't want the cost, so they sign off. I mean, they actually know. I guess it comes under known dangers also, but if they know they're not going to have it, haven't they made a decision that they don't want it? That's what's lacking in this record. There's no evidence that the Army was given that information and made that decision. The fact that it appears in the PIDs, and by the way, the PIDs that we have for the engine, everybody agrees there's no signature on it by the Army, we don't have a signed copy by the Army, but if we assume they saw it at some point, the critical element for Boyle is that there was a discretionary decision, as you described, Your Honor, that they said, okay, we understand this risk and we're not going to do it. The interesting thing that cuts against that is when the IPT team determined that water could cause this engine to flame out, their recommendation was put continuous ignition in. That fact, from that fact, it can easily be inferred that that discussion never occurred and or that nobody knew it could happen. Otherwise, perhaps there would have been a different statement in the PIDs. I'm not sure how that proves the proposition you set up and say nobody knew it could happen. So that explains why the Army would have said the first time around, we don't want to pay for anything beyond this to specificate exercise judgment, because I think that's the requirement, not Army mandates. It's exercise judgment. They could exercise judgment. We don't want the additional cost, don't want additional weight, don't want additional anything. They can do that. But if the manufacturers are going to avail themselves of that argument, they have to come forward with evidence that that's what happened. And evidence that there was back and forth during this process doesn't satisfy that. There has to be evidence that that's what that's the decision that was made. And what I'm saying is that what occurred afterward is evidence that that didn't go on. Otherwise, it would have happened to begin with. Or we'd have a record like we have of the IPT where somebody said this can happen, and therefore we're going to put this on. Roberts. Well, I have trouble saying that the after-the-fact analysis is something you automatically assume goes on in the same form before. I mean, after the fact, we always have the benefit of hindsight. And I wouldn't expect it to be documented the same way when the specifications are being reviewed and approved in the first instance. Correct. And I don't disagree with that. I'm just saying within the context of this case, that's what's important, is that how it occurred in this case. And it's also important to remember that in the record, Mike McCall, among others, an engineer at the Army Engineering Department, specifically testified that no one from Boeing, Honeywell, or Goodrich, recommended or advised that they needed continuous or automatic ignition on this engine. Well, I'm not sure I understand how that makes the point you're currently trying to make, which is, did the Army review the specification and exercise discretion in approving it? That doesn't mean that they had to turn down a recommendation by the manufacturer to do something different. No, but it means that the recommendation was never made, therefore the Army never had the opportunity to exercise its discretion to either put it in or not put it in. That's what it means, and that's why it's important. And if there are no other questions at this point, I'd like to reserve the balance for rebuttal. That's fine. We'll hear from defendants, and you'll have to be mindful of the time and give us the sequence of appearances. Yes, Your Honor. Good morning. My name is Jim Houston of Morrison and Forster in San Diego. I'm here on behalf of Honeywell. Before you start the clock, can you stop it for a second? Can you give us the cast of characters so we know what to anticipate? You're here for Honeywell. Yes, sir. Who will be next? I will be taking 8 minutes, if it's okay with the Court. Okay. Following me will be maybe 9 minutes, because I also am going to address the Federal Tort Claims Act, and Mr. Bell secretly gave me one extra minute just now. Following me will be Mr. Alan Collier on behalf of Goodrich for 5 minutes. Following him will be Mr. Bell on behalf of Boeing for 4 minutes. And following him will be Mr. Sutherland on behalf of ATEC, only on the jurisdictional issue. Okay. Thank you. Start it up again. Thank you, Your Honor. As I said, my name is Jim Houston. I'm here on behalf of Honeywell to discuss the cases, excuse me, the court below's decision on summary judgment for Honeywell. That is clearly, in my opinion, the correct decision. This is an engine that has been within the Army Air Force service, mostly the Air Force, excuse me, mostly the Army, but it goes back to the 50s with the Air Force and the various iterations of this engine for over 50 years. So when cases like Kerstetter talk about a continuous back and forth on the engine design, there has been a continuous back and forth through the many different stages and designs of this engine for now 50 years of operation. During that operation, there has never been a flameout in the entire history of the operation of this engine. So the defect that is alleged by plaintiffs, that this engine failed to have continuous ignition, which is finally what they have said is erroneous about the engine, is very clearly something that would not have been called for in the ordinary design. But just to be clear, it was specifically called out in the PIDs, which is based on a very specific Army design specification, the 8593D spec, which tells you how you will submit your design specification to the Army for an engine. Your spec has to follow that paragraph by paragraph, and it does for 250 pages. In the ignition section, it specifically lays out the types of coil, the kind of electricity, the kind of ignition that will be required, and then it goes on to say, continuous duty ignition capability is not provided. Mr. De Loso implied that the Army didn't really think about that. There was no consideration. There was no judgment involved. That is simply contrary to the evidence, the undisputed evidence. Mr. Powelson's declaration, he was the director of the Army Engineering Directorate during the time, and just prior to that was the director of the turbo and turbine engine section of that directorate, said specifically in his declaration, we knew of the capability for auto ignition and continuous ignition. We had those capabilities in other helicopters and in other engines. We chose not to include it in this helicopter. And, again, looking back, it makes perfect sense. There had never been a problem. There is no reason to do the research and development and the additional cost necessary to put something into an engine that has not demonstrated any propensity towards this kind of a problem at all. So it makes perfect sense the Army did consider it, did specifically consider the continuous ignition and rejected it. That is exactly what is required by Boyle. If you go into the specs a little bit deeper for the lack of signature, as Mr. De Loso has said, again, the specification is regulated. 8593D has nowhere a requirement that the Army sign it. In fact, because it doesn't, there is an absence of signature. There is no provision. There is no paragraph for an Army signature. The way that it is done is after the specification is accepted and reviewed, there is an extensive period of qualification testing, test flying, review of the engine, review of its performance, review of the tests, and then a certification from the Army that it has, in fact, met and complied with all design and performance specifications. Both of those documents were issued. Both of those documents were signed by the Army. We have the signed qualification certificate in the record signed by Mr. Powelson, the then head of the Army Engineering Directorate. The failure to warn that was mentioned by Judge Wallace briefly I think is a non-issue. There was nothing known to Honeywell or the Army that anybody should warn anybody else about. There was no propensity. There was no issue. And if you really drill into what it would be that you would warn the Army about, it would be what they allege was missing, a lack of a continuous ignition capability. Yet how can you warn the Army about something that they specifically said we don't want and require that that go into the contract? They then know about it because they've signed off on the contract. And Mr. Powelson specifically said that he was aware of the ability to use continuous ignition and chose not to do it. So there is nothing to warn about, either under the Boyle standard, the third prong where you must tell the Army or the government about known dangers, or even under our California standard where it says you must tell them about everything you know of or should have known of. There is nothing here that they should have known or did know about that they failed to warn the Army about. If I could then briefly turn to the Federal Tort Claims Act and the combatant activities exception that was mentioned by Judge Noonan, I would have to say that this is a case that is directly on point for the affirmance of a summary judgment based on the combatant activities exception. As you can see from the record, we brought a previous summary judgment based on combatant activities that was denied by Judge Wilkin. There is, of course, as the Ninth Circuit case law says, no obligation to cross-appeal. In fact, a cross-appeal is prohibited. But it can, one can mention this additional grounds for sustaining a summary judgment on appeal with the appeal itself, which is what we've done. Can I ask you a question on that? Yes, sir. I've been trying to work with this issue. It's not an easy issue to deal with because something in this case happened 20 years before the actual accident. They put the machine in, or however many years it was. It's not like something occurring at the time of combat, but something that occurred prior to it, and then it gets to that place. And it struck me that, as distinguished from the contractor's defense, that this is a little package that needs to have some type of process of how far it can go. And I noticed in Johnson it used the word degree of connectivity. And being an old trial lawyer, right away proximate cause comes to mind. And I'm wondering whether or not there are some limitations to this particular issue, different from contractor defense, which can happen any time along the line, that it has to have a degree of connectivity to the actual combat and not being put in 20 years earlier. Now, I haven't thought this out. As a matter of fact, it came to me as I was going to sleep last night, so that's what it's good for, nothing. But doesn't it make some sense, and is there any law that limits this particular defense to something like proximate cause when our Johnson case refers to degree of connectivity? I believe Johnson, which is a very interesting case and deals with a clam farmer, which, of course, puts to rest, I think, the idea that this applies only to foreign targeted individuals, enemy or perceived enemies. This was an American clam farmer, if I recall, in the Washington State area. And the claim was because a ship returning from World War II dumped a bunch of oil onto the clam beds and killed them. The connectivity I believe Johnson is describing is the connectivity to the combat arena. And the reason that that case was dismissed and that the FTCA combatant activities exception did not apply was because World War II had been over. The Japanese had signed a surrender document months before the ship was simply returning into the peace arena, which is the continental United States, and that's where the event occurred. I believe the connectivity referred to by the Ninth Circuit in Johnson and expected, and which makes sense, is that the events out of which these claims arise occur in a combat zone, a combat arena. Now, this is dead center in that target. This is the exact center of that. We have a helicopter that is a special operations helicopter, where Boeing isn't even allowed to know what the contents of that helicopter are. But I suppose I see your point, but maybe the question I might say, it didn't happen here. Actually, the cause started when it was installed in the helicopter. You mean when the helicopter was put into operation? Yeah. And I agree. If it were a training exercise, for example, there would be an exposure to liability, subject to, of course, the government contract of defense. But you don't have to get to the contract of defense if that same helicopter is operating in combat. In Kuhi, for example, it was about a weapons system. It was about a missile that shot down an Iranian airliner that they thought was an F-14. Well, that missile system was built a long time before that missile was fired and shot down a plane. So the connectivity required is the combat arena itself. Obviously, you can't apply this to contractors like Kuhi or others. Saleh, the D.C. Circuit opinion that's on cert petition right now that has not yet been granted or denied, doesn't talk about, well, you hired this guy four years ago or three years ago. They talk about what happened. How do we get into this? And what they're trying to really prevent is, for example, us taking the depositions of the flight commander and the squadron commander and finding out why were you flying at 100 feet on night vision goggles and icing when it was supposedly an innocuous flight. That doesn't make sense. Are we going to get in and question the military decision-making process? Are we going to challenge what they did, get into classified missions, classified documents? And I think it makes sense what the Ninth Circuit has done. Clearly in Kuhi, Benslin did an excellent job of analyzing this and others. Since, we're going to draw a circle around the combat arena. And at least when you're dealing with weapon systems, combat operations, this is a clear case for dismissing the case based on the combatant activities exception. That's all the time that I have. Excuse me. Good morning. My name is Alan Collier. I represent Goodrich in this case. I want to put this case, we've been talking about combatant activities, which I don't want to talk about here today, but I'd like to put this case into context a little bit because we're not just talking about a product. We're not just talking about a military product. We're talking about a helicopter engine, and then my product, which is the FADEC, that was specifically designed for special ops. So this is a specific special operations, and it was made for the 160th Division for the exact mission we're seeing here, which is going into combat. Now, the FADEC is made up of two components we've heard about, if you don't understand. It's actually a computer, and it's also the mechanism that allows fuel flow. And here I think Judge Wilkin got it right on is Goodrich has met its burden here. It hasn't been overcome by the plaintiffs. As far as the reasonably precise specs, yes, the initial design was made for the Royal Air Force, which, you know, obviously is the U.S.'s biggest ally, but that doesn't change the analysis. It's actually part of the discretionary function that our government, the Army, can go to the Royal Air Force and take that design that was already started and then review it again. There's plenty of evidence that this thing was gone over by the government. We had numerous meetings, and it's part of the Gentile Declaration in our motion. That actually goes after all the meetings in which actually the Army said, well, we don't like that part of the RAF spec. We want to do something differently. They rejected part of those specs. So we not only apply reasonably precise specs under the PIDs, which actually deals directly with the DECU, but also we put out our own spec here that was approved. It's very detailed. There's algorithms and logic that go to the DECU, and that was all approved. And there's plenty of back and forth. I mean, it kind of begs the question, what was the government doing for five years as they were going back and forth to do this procurement process? Real quick on this e-mail, which Mr. DeLussa talks about as far as conformance to spec. It's really a red herring here. This is an e-mail that was written 20 years after the design. Judge Wilkins said there was no foundation for it. And really, it was calling upon, during the investigation of this accident, looking at an input-output matrix that had nothing. It didn't talk about a spec. And it was actually something that was supposed to be supplied by Boeing and Honeywell. It doesn't go to the issue of whether Goodrich conformed to spec. I think that's well proven. So the real evidence is that not only did the government approve it, but the DECU passed functional testing at the time it was given to the Army, and then even after this accident, after the accident actually was put through a testing program, it actually passed. So just real quick, because I'm getting out of time. As far as the failure to warn, there's plenty of evidence that we warned every known danger to the government. We actually were required to put out what's called a failure modes and effects analysis that specifically says if you have an electrical issue on the FADEC, you can have engine failure. So, I mean, that was specifically done with the government. So I'm going to pass my time over because I'm done unless you have any questions. Okay. Good morning. May it please the Court, my name is Steve Bell, and I represent the Boeing Company. I'd like to start by saying that Boeing agrees with everything the counsel for Honeywell and Goodrich has told the Court this morning. Harmony has broken out. There's peace at least on one side of the room. If my client Boeing had installed the Honeywell engines and the Goodrich DECU, had gone out, selected them, procured them, and installed them, Boeing would be entitled to affirmance on the summary judgment on the Boyle defense, the same as Honeywell and Goodrich. But there's actually an easier ground for Boeing here, and that is Boeing never touched the engine or DECU that were on the accident aircraft. Boeing has never supplied, designed, manufactured, or sold engines or engine control systems like DECUs, never in its history. That's common in the aviation industry where customers buy engines and engine controls separately from the airframe. Here the Army procured those products and on the aircraft originally instructed Boeing in the prime item development specification for the aircraft, not the specification for the engine. Install this engine, install this DECU. Years later, the Army procured directly from Goodrich a new model DECU, procured directly from Honeywell a new model engine, and the Army itself installed them. When this ship was acquired by the Army from Italy, was brought back, did Boeing do any work, a reconfiguration of the hull before it was prepared to go off and do its mission? Depends on which time you're talking about, Your Honor. The Army procured 15 aircraft originally designed. Well, I'm talking about the one that was being built in Italy for the Shaw. Right. And the Army bought it and then brought it back. And that vehicle I'm referring to as the one that crashed in Afghanistan. The Army bought those 15, brought them back to the United States. The Army itself made the slight modifications necessary so that those aircraft would conform to the U.S. Army specification. Yeah, I guess the answer is no. Well, can I go to the second step? Boeing didn't do anything? Boeing did not. They went from Italy to the U.S. Army to the Pennsylvania National Guard. Some years later, the Army took those aircraft, which had been used by the National Guard, delivered them to Boeing. Boeing took out all of the moving parts, stripped them down to the airframe, and then from the ground up built the MH-47E and delivered it to the U.S. Army. That's the aircraft that crashed. I see. Okay, I understand. I think I'm out of time. Thank you. Mr. Bell, I want to ask you, I know that you were at Bolton, graduated in 1973. Yes, Your Honor. Did you ever have a course with me? No, but I did attend a couple of your lectures, and I remember them fondly. Well, just a background fact. I still remember my canon law. May it please the Court. My name is Kevin Southerland. I'm counsel for AT Engine Controls, an English entity. The Court dismissed based on the California long-arm statute. The appellants did not address the arguments regarding the jurisdictional issue. I just want to briefly say that the district court got it right. The California long-arm statute applies here. The federal long-arm statute does not apply. Plaintiff state law causes of action in the complaint do not arise under federal law such that it's appropriate to invoke Federal Rule of Civil Procedure 4K2. The evidence is uncontradicted and clear that there's absolutely no context with or jurisdiction in California. And unless the Court has any questions, I'd like to reserve at least a minute in the event that there's comments from the appellants. Whether you can have a minute or not for rebuttal to defense is up to my colleague. But what I do want to ask the question is, there's nothing by way of contract, correspondence, telephone calls from your client to any of the participants in this group that is any of the defendants, your co-defendants? Well, there were certainly none. Our client submitted a declaration of the chairman of the company, Terry Madden. Those declarations were clear that there were absolutely no contacts with California. It didn't deal with them. Of your company or its predecessors. I remember that. But was there any evidence on any other contacts outside of California in the United States? No, other than the fact that the DECU unit was not manufactured by my client. The theory that the plaintiffs put forward in the motion or in the opposition was that the Court ought to take, ought to recognize supposed contacts of our predecessors' predecessors. And I use the term predecessors with quotes because we're not admitting that they're predecessors at all. The record, which is the declaration of Terry Madden and his reply declaration, makes clear that there were several corporate successions involved from the company that manufactured the DECU to where we are. We're just not the manufacturer of this particular DECU, and the record's clear on that. And then there was nothing else in the record to any other state in the United States of contacts, et cetera? Other than the fact that this DECU was delivered in Connecticut. That is, it was flown over to Connecticut from England. Correct. It was shipped from the manufacturer to Connecticut. Okay. Thank you. Thank you, Your Honor. Rebuttal. And I'll assure you that silence on a given topic is not taken to be concession, because I understand that you have to decide narrowly what to speak to, so. Thank you, Your Honor. Briefly on jurisdiction. We're relying entirely on the Supreme Court's decision in Mesa which simply says that when you have removal under the Federal Officer Removal Statute that alleges a Federal defense as was done in this case, then jurisdiction is arising under. 402K is implicated. 4K2 is implicated. And therefore, the proper test is not test with the jurisdiction contacts, I'm sorry, with the jurisdiction where the case is pending, but rather national contacts. I'd like to address briefly the fair to warn issue. The fair to warn issue cannot survive either under Boyle or under the independent ground that they have to show, that manufacturers have to show they were precluded from warning. Because if the Court recalls, there's been a somewhat contrary position. In arguing the warning claim, they've said we had no duty to warn because everybody knew the engine could flame out. But when attempting to support what's in the PIDs about the ignition system, the argument is everybody did know or didn't know, and so therefore we didn't have to do it. So there has to be we would submit some consistency. And the consistency is provided by the testimony of the Army people that say nobody offered it, nobody discussed it, number one. Number two, that we in the Army were not aware of it, but Mr. Kaplan, when he was posed for Boeing, quite clearly said, yes, we were aware of that as an issue. And that at least raises an issue of fact as to the warning claim. There are also issues of fact as to all of the other specifications, how they came to be done, that simply declarations that say back and forth do not get us there under Boyle. The Snell case is very clear about that. Just the fact that there's a back and forth doesn't get you there. And before I close, I'd like to make one comment about CUI, and that is there is connectivity. But certainly we know at one spectrum that a warship coming back that leaks oil, there's no CUI protection. We also know that if the decision is made at the time of combat, there's certainly the government is immune, whether the manufacturer is immune is a question of what was employed and whether that manufacturer had a duty to the perceived enemy. And then we have where we are in this case, which is they're coming back. In some sense, they're like the warship returning home. The fact that there was combat at some point before they came home doesn't mean they fall necessarily within the exception. The last point I would like to make is that in considering this case on all the Boyle prongs, this is unlike almost any other case that has invoked this relative to a military airplane because in this situation, one of the components that's alleged to have failed, the DECU, was already designed before the Army became involved. The manufacturers got together and marketed this product to the Army, not vice versa. So by the time the Army got involved, the product was already designed. It was already in production. There was already testing going on. And in order then to establish that the manufacturers were deeply involved for Boyle purposes, there has to be a greater showing than, well, there was back and forth. Back and forth about what? About the color, where the nameplate goes? How many you're going to build? What cost? That's all back and forth. And there has to be more than a DV-250 because that doesn't tell us much. Certainly the policy that underlines Boyle says that we don't want to burden a manufacturer with the costs associated with a design defect that was mandated by the government, that the government laid out, that the government commanded. If that's true, the flip side has to be true, and that is servicemen and their families shouldn't bear the burden of design decisions made by manufacturers that are then sold to the Army, as occurred in this case. Thank you. Let me ask you a question. This is a defense. A contractor's defense is a defense. Who has the burden of proof? The manufacturers have the burden of proof. If it's an affirmative defense, and because this arose on summary judgment, they have to prove that no reasonable jury could conclude other than the three prongs are satisfied. Okay. Thank you. Okay. We thank all counsel for your helpful arguments. The case just argued is submitted. That concludes the calendar for today. We're adjourned. All rise.
judges: Wallace, Noonan, Clifton